CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

2/23/2018

JULIA C. DUDLEY, CLERK
BY:  S/J.Vasquez
           DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Harrisonburg Division

**KYLE E. ALMOND, and**
**LYNN P. ALMOND,**

   **Plaintiffs,**

**v.**

   Civil Case No. <u>5:18-cv-00046</u>

**EDWARD D. JONES & CO., L.P.,**
**Serve Registered Agent:**
   **CT Corporation System**
   **4701 Cox Rd., Suite 285**
   **Glen Allen, VA 23060**
   **Henrico County**

   **Defendant.**

## <u>COMPLAINT</u>

Plaintiffs Kyle and Lynn Almond set forth and allege the following Complaint against

Defendant Edward D. Jones & Co., L.P..

### Parties

1.  Plaintiffs Kyle E. Almond and Lynn P. Almond are individuals living in Hightown,

Virginia (Highland County) at all relevant times herein.

2.  Respondent Edward D. Jones & Co. L.P. (hereafter "Edward Jones") is a Missouri

Limited Partnership with it principal place of business located in St. Louis, Missouri.  Edward

Jones is a registered securities Broker-Dealer and a member of FINRA.

### Jurisdiction and Venue

3.  Diversity jurisdiction is appropriate pursuant to 28 U.S.C. § 1332.  Complete diversity

of citizenship exists between all Plaintiffs and Defendant.  The amount in controversy exceeds

$75,000.00.

4.  Venue is proper in this District because Plaintiffs have lived in this District during all relevant times herein, and the underlying facts of this case involve Defendant providing services to Plaintiffs in this District.

5.  As set out in more detail below, the Defendant in this case contracted to provide services or things in this Commonwealth, caused tortious injury in this Commonwealth by acts or omissions within and outside this Commonwealth, regularly did or solicited business in this Commonwealth, engaged in persistent courses of conduct in this Commonwealth, and derived substantial revenue from goods used or consumed or services rendered, in this Commonwealth. Accordingly, they are subject to the personal jurisdiction of this Court pursuant to Va. Code § 8.01-328.1.

**Facts**

6.  Kyle and Lynn Almond are a retired married couple residing in Hightown, Virginia. They met with Edward Jones' registered representative and advisor, Hardy Dawkins in Staunton, Virginia in 2007 to discuss the investment of their retirement monies to provide them both a steady stream of retirement income for the rest of their lives.  At the time the amount of money to be invested was approximately $425,000.00 which was a payout from Mr. Almond's pension.  Mr. Dawkins was a registered securities representative of Edward Jones, and was registered to sell securities in the Commonwealth of Virginia.

7.  Mr. Dawkins recommended that the Almonds invest in a Hartford variable annuity. Mr. Dawkins told the Almonds that they would receive $1,726.00 a month for the rest of their lives from the annuity, and if either one died, the other would continue to receive the $1,726.00 a

month.  Based on these representations, the Almonds agreed to purchase the variable annuity.

8.  Attached as Exhibit 1 is a February 2, 2007 email from Mr. Almond to Mr. Dawkins regarding the initial documents received regarding the annuity.  Mr. Almond raised his concerns regarding the annuity's reference to "Single," and asks to confirm that they would receive "$1,726 as long as I live and when I die, Lynn will receive at least $1,726 as long as she lives." Below the email are Mr. Almond's notes from the response phone call from Mr. Dawkins in which Mr. Almond was told:  "1770 min for me and same amt for Lynn…"

9.  Later in February, 2007, Mr. Almond sent another email on February 27, 2007 after receiving a benefit statement from the annuity that again raised his concerns that the annuity was not set up as promised.  Attached Exhibit 2.  In the second email, Mr. Almond again raised his concerns that the documentation is not matching with the representations made by Mr. Dawkins.  Mr. Almond wrote:

> "However, the big awful word "SINGLE" is still coming out on the form.  I do need confirmation that this will run for Lynn her lifetime after mine at no less that the 1770 we discussed…"

10.  When a copy of this email was sent in a complaint letter sent in 2017, Edward Jones claimed it was not received back in 2007.  Even if it wasn't received, however, it demonstrates the Almonds' belief at the time, based on Mr. Dawkins's representations, that the monthly payment was to be made to both Kyle and Lynn as long as they lived.

11.  In response the Almonds' concerns about payments for both of their lives, and the emails, Mr. Dawkins issued a new policy that allegedly corrected the error and made the minimum monthly payment applicable to both Mr. and Mrs. Almond.  Attached as Exhibit 3 is a

-3-

handwritten letter sent the next day (February 28, 2007) in which Mr. Dawkins wrote: "Here's the revised annuity contract from Hartford.  Looks like they got it right this time!"  After receiving the letter and revised annuity, the Almonds went to Staunton, Virginia to meet Mr. Dawkins again.  At the meeting Mr. Dawkins again confirmed his prior statements that the annuity would pay the minimum amount through both lifetimes.  Based on the letter and meeting, the Almonds were convinced by Mr. Dawkins that the error had been corrected, and they would receive the monthly payment through both lifetimes.

12. Mr. Almond discussed the variable annuity again with Mr. Dawkins in 2013, and was again falsely told by Mr. Dawkins that the variable annuity would pay the set income payments for both of the Almonds' lives.

13. The Almonds received their monthly annuity payments until October, 2016 when they received a letter from Edward Jones asking the Almonds to sign certain forms regarding the annuity to carry out a custodial ownership change to Edward Jones.   The documents made a reference to a "Joint Rider" and Mr. Almond called Mr. Dawkins to ask him about it.  After review, Mr. Dawkins called back and told Mr. Almond, for the first time, that the contract was only written as a single life contract and only guaranteed income for Mr. Almond's lifetime. When asked about his prior contrary statements, Mr. Dawkins said "How can I remember what I said ten years ago."

14. Kyle Almond was shocked and upset about the prior contradictory statements made by Mr. Dawkins, and asked Mr. Dawkins to have someone from Edward Jones call him so he could make a formal complaint.  Mr. Dawkins called back about a week later and claimed that the Edward Jones legal department had decided to take no action.  The Almonds' received no

-4-

documentation of this claim.  Mr. Almond subsequently tried to resolve the matter with Mr. Dawkins, but Mr. Dawkins had no interest in doing so.

15.  The Almonds subsequently retained counsel on a *pro bono* basis to send a letter in 2017 again raising the misrepresentations about the annuity.  Edward Jones responded by refusing to comply with its advisor's promises, and refusing to fix the error in the variable annuity.

16.  As is set out very clearly in a contemporaneous document, Exhibit 1, the Almonds wanted the guaranteed monthly payment for both of their lives, and Mr. Dawkins (Edward Jones's agent) had assured them that the variable annuity would do so.  These assurances were false, and for the reasons set out herein, Edward Jones should be required to correct the erroneous annuity so it complies with how it was sold.

17.  Edward Jones is jointly and severally liable for all wrongful acts of Mr. Dawkins due to its control over said registered representative, Mr. Dawkins's status as an agent and Financial Advisor, Edward Jones's failure to properly supervise its registered representative, its lack of good faith supervision and negligent supervision, *respondeat superior*, "control person" liability under Virginia and federal law, and its adoption and ratification of the wrongful acts of said registered representative alleged herein.

18.  The recommendations by Mr. Dawkins and Defendant to purchase the variable annuity as actually written with guaranteed income only on Mr. Almond's life was not suitable for the Plaintiffs because it did not meet their stated need for steady guaranteed income for both of their lives.  These unsuitable recommendations violated FINRA Rules and Virginia Insurance Regulations.

19.  Shortly after discovering the fraud by Mr. Dawkins and Defendant, the Almonds filed a FINRA arbitration claim against the Defendant on March 24, 2017.  FINRA is the self-regulatory organization which regulates the securities industry in the United States.  Defendant Edward Jones is a member of FINRA.  Edward Jones signed and submitted a Submission Agreement with FINRA submitting all claims to binding arbitration, and agreeing to be bound by FINRA arbitration procedures and rules.

20.  In the arbitration, Defendant filed a Motion to Dismiss based on FINRA's six year eligibility Rule, 12206, which states in relevant part as follows:

"12206. Time Limits
(a) Time Limitation on Submission of Claims
No claim shall be eligible for submission to arbitration under the Code where six years have elapsed from the occurrence or event giving rise to the claim. The panel will resolve any questions regarding the eligibility of a claim under this rule.
(b) Dismissal under Rule
Dismissal of a claim under this rule does not prohibit a party from pursuing the claim in court. By filing a motion to dismiss a claim under this rule, the moving party agrees that if the panel dismisses a claim under this rule, the non-moving party may withdraw any remaining related claims without prejudice and may pursue all of the claims in court.
…
 (c) Effect of Rule on Time Limits for Filing Claim in Court
The rule does not extend applicable statutes of limitations; nor shall the six-year time limit on the submission of claims apply to any claim that is directed to arbitration by a court of competent jurisdiction upon request of a member or associated person. However, when a claimant files a statement of claim in arbitration, any time limits for the filing of the claim in court will be tolled while FINRA retains jurisdiction of the claim."

21.  Notably, Rule 12206 is not a statute of limitation, but only a Rule that determines eligibility of claims for FINRA arbitration.  Defendant argued to the arbitration panel that the eligibility rule was not subject to equitable tolling, nor subject to delays of the beginning of the eligibility period due to fraudulent concealment or fraudulent misrepresentations.

22.  On December 4, 2017 FINRA advised the parties that the arbitration panel had granted the Motion to Dismiss based on Rule 12206, and dismissed the claims without prejudice. Pursuant to FINRA Rule 12206, "Dismissal of a claim under this rule does not prohibit a party from pursuing the claim in court."  Furthermore, under section (c) of the Rule, "any time limits for the filing of the claim in court will be tolled while FINRA retains jurisdiction of the claim." Accordingly, dismissal under the Rule was without prejudice, the Rule allows this court filing after dismissal, and the time period that these claims were in arbitration (March 24, 2017 to December 4, 2017) should not be used in any statute of limitation calculation for this court case.

23.  While engaged in the tortious and fraudulent acts set out herein, Mr. Dawkins was acting within the ordinary course of the business and the apparent authority for which he was an agent for Defendant.  Furthermore, a principal such as Defendant who puts a servant or other agent (Dawkins) in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud.  The principal is subject to liability even if it is entirely innocent, has received no benefit from the transaction, and, even if the agent acted solely for his own purposes.

24.  The action and inaction of the Defendant herein, acting separately or through its agent, was reckless and was taken with a conscious disregard for the rights of the Plaintiffs.

**Count I.**
**Violations of the Virginia Securities Act**

25.  The allegations contained in paragraphs 1 through 24 are re-alleged and incorporated herein.

26. The Virginia Securities Act, Va. Code §§ 13.1-502 and 13.1-522, imposes civil liability upon persons for the commission of securities fraud.  Specifically, §13.1-502 makes it unlawful, in the offer or sale of any securities:

"(1)  To employ any device, scheme or artifice to defraud, or (2) To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) To engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser."

27. In addition to setting out civil liability for a violation of Va. Code §13.1-502 above, §13.1-522 also holds liable a person who:

"receives, directly or indirectly, any consideration from another person for advice as to the value of securities or their purchase or sale, whether through the issuance of analyses, reports or otherwise and employs any device, scheme, or artifice to defraud such other person or engages in any act, practice or course of business which operates or would operate as a fraud or deceit on such other person…"

28. While mirroring the federal securities laws in some respects, the Virginia Securities Act has several important distinctions.  "Unlike its federal counterpart, the Virginia Securities Act does not require scienter.  A plaintiff need not establish that the fraudulent representation was made knowingly or with reckless indifference to its truth or falsity; the mere fact of the issuance of the statement is enough."  Diaz Vicente v. Obenauer, 736 F.Supp. 679, 693 (E.D. Va. 1990).  Furthermore, the Virginia Securities Act does not require proof of either reliance or causation. Dunn v. Borta, 369 F.3d 421, 432-433 (4th Cir. 2004).

29. Defendant breached its trust and violated the Virginia Securities Act by engaging in a course of deceptive schemes, devices, misrepresentations of material fact and omissions of material fact related to the sale of securities.  Defendant, as a control person, further breached its

trust and violated the Virginia Securities Act by failing to supervise and control their registered representative and agent, by failing to redress the injury and losses the Plaintiffs incurred, and by other conduct as alleged herein.  Defendant's misrepresentations and omissions were meant to be acted upon and were acted upon by Plaintiffs to their detriment.

30.  As a direct and proximate result of the Defendant's aforesaid conduct, Plaintiffs incurred damages of up to $425,000.00 together with interest, costs, attorney fees and loss of use of investment funds.

### Count II.
### Federal Securities Fraud

31.  The allegations contained in paragraphs 1 through 30 are re-alleged and incorporated herein.

32.   Federal securities fraud under Section 10(b) of the Securities Exchange Act of 1934 is defined as "(1) material misstatements or omissions, (2) indicating an intent to deceive or defraud, (3) in connection with the purchase or sale of a security."  Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020 (2nd Cir. 1993).

33.  Defendant breached its trust and committed federal securities fraud by engaging in a course of deceptive schemes, devices, misrepresentations of material fact and omissions of material fact in connection with the sale of a security.  Defendant, through Mr. Dawkins, intended to deceive and did deceive the Plaintiffs regarding the variable annuity he recommended to them.  Defendant, as a control person, further breached their trust and committed securities fraud by failing to supervise and control their registered representative and agent, by failing to redress the injury and losses the Plaintiffs incurred, and by other conduct as

alleged herein.  Defendant's misrepresentations and omissions were meant to be acted upon and were acted upon by Plaintiffs to their detriment.

34.  As a direct and proximate result of the Defendant's aforesaid conduct, Plaintiffs incurred damages of up to $425,000.00 together with interest, costs, and loss of use of investment funds.

## Count III.
## Fraud

35.  The allegations contained in paragraphs 1 through 34 are re-alleged and incorporated herein.

36.  The elements of a cause of action for common law fraud in Virginia are set out in Van Deusen v. Snead, 247 Va. 324, 327 (1994):

> "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to him."

37.  Defendant breached its trust and committed fraud by making false representations of material fact about the variable annuity being sold.  These false representations were made intentionally or knowingly, with the intent to mislead.  Plaintiffs relied upon these misrepresentations and were damaged as a result of the misrepresentations.

38.  As a direct and proximate result of the Defendant's fraud, Plaintiffs incurred damages of up to $425,000.00 together with interest, costs, and loss of use of investment funds.

## Count IV.
## Constructive Fraud

39.  The allegations contained in paragraphs 1 through 40 are re-alleged and incorporated herein.

40.  The elements of a cause of action for common law fraud in Virginia are set out in

Van Deusen v. Snead, 247 Va. 324, 327 (1994):

> "(1) a false representation, (2) of a material fact, (3) made intentionally and
> knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6)
> resulting damage to him."

"Constructive fraud differs from actual fraud in that the misrepresentation of material fact is not

made with the intent to mislead, but is made innocently or negligently although resulting in

damage to the one relying on it."  Evaluation Research Corp. v. Alequin, 247 Va. 143, 149

(1994).

41.  As set out above, Mr. Dawkins, as an agent of Defendant, made false representations

of material fact to Plaintiffs regarding the variable annuity he was recommending and selling to

them.  These misrepresentations were made negligently by Mr. Dawkins.  Plaintiffs relied on

these misrepresentations resulting in the damages to them set out herein.

42.  As a direct and proximate result of the Defendant's constructive fraud, Plaintiffs

incurred damages of up to $425,000.00 together with interest, costs, and loss of use of

investment funds.

### Count V.
### Securities and Investments Recommended and Purchased Were Unsuitable
### Under Virginia Insurance Regulations, Virginia Law, Federal Law, and FINRA Conduct
### Rules

43.  The allegations contained in paragraphs 1 through 42 are re-alleged and incorporated

herein.

44.  FINRA Conduct Rule 2310 (effective until replaced by Rule 2111 on July 9, 2012)

required that FINRA members "shall make reasonable efforts to obtain information concerning:

(1) the customer's financial status; (2) the customer's tax status; (3) the customer's investment objectives; and (4) such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer."  This information is then to be used in making a suitability determination under Rule 2310:

> "(a) In recommending to a customer the purchase, sale or exchange of any security, member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs."

45.  Although it was not the case here, the U.S. Securities and Exchange Commission has found that even if an investor's objective is to quickly multiply his/her money, the broker is still bound to only recommend trades suitable to the investor's "situation."  In an appeal from a NASD disciplinary action, the SEC stated:

> "Pinchas [broker] argued before the NASD that Wang [customer] insisted that her investment be multiplied quickly so that she could purchase a house.  Wang denied Pinchas' assertion.  However, even if Wang had desired Pinchas to double her money, **that desire would not have relieved Pinchas from his duty to recommend only those trades suitable to her situation**."

In Re Rafael Pinchas, S.E.C. Rel No. 41816, Admin. Proc. File No. 3-9639 (Sept. 1, 1999) (emphasis added).  See also In Re Larry Klein, S.E.C. Rel. No. 34-37835, Admin. Proc. File No. 3-8761 (Oct. 17, 1996) ("A representative may make 'only such recommendations as would be consistent with [his customer's] financial situation and needs.'")

46.  An unsuitability claim is also a subset of 10(b) securities fraud (referenced above) with the following elements to be proved:

> "(1) that the securities purchased were unsuited to the buyer's needs; (2) that the defendant knew or reasonably believed the securities were unsuited to the buyer's needs; (3) that the defendant recommended or purchased the unsuitable securities for the buyer anyway; (4) that, with scienter, the defendant made material misrepresentations (or,

owing a duty to the buyer, failed to disclose material information) relating to the suitability of the securities; and (5) that the buyer justifiably relied to its detriment on the defendant's fraudulent conduct."

Banca Cremi, S.A. v. Alex. Brown & Sons, Inc. 132 F.3d 1017, 1032 (4th Cir. 1997). "For Rule

10(b)(5) purposes, scienter includes recklessness." Breard v. Sachnoff & Weaver, Ltd., 941 F.2d

142, 144 (2nd Cir. 1991).

47.  Virginia Insurance Regulations (14 VAC 5-45-40) further require that any recommendations of variable annuities must be suitable, and that an adequate supervisory system be in place to supervise the suitability of such recommendations.

48.  Defendant's recommendations of an unsuitable variable annuity was unsuitable for Plaintiffs based upon their need for income for both of the Plaintiffs lives, their objectives and risk tolerance, lack of other income-producing investments, income needs, investment experience, goals, risk tolerance, needs, and income.

49.  At the time Defendant made recommendations and investments of a security, it knew or reasonably believed that the security or investment was unsuitable or it made the recommendation and investments in reckless disregard of whether or not the security or investment was suitable for Plaintiffs.

50.  Defendant intended that Plaintiffs rely on Defendant's recommendations and Plaintiffs did rely on Defendant's recommendations.

51.  The Defendant's wrongful conduct constituted securities fraud and was a violation of the Virginia Securities Act, section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5 promulgated thereunder, and FINRA Rules, including the FINRA requirement of high standards of commercial honor and just and equitable principles of trade.   The unsuitable

recommendations further constitute breach of contract, breach of fiduciary duty, and negligence as alleged herein.

52.  As a direct and proximate result of the Defendant's aforesaid conduct, Plaintiffs have incurred damages of up to$425,000.00, together with interest, costs, and loss of use of investment funds.

**Count VI.**
**Negligence and Negligent Supervision**

53.  The allegations contained in paragraphs 1 through 52 are re-alleged and incorporated herein.

54.  As set out in <u>Merrill Lynch, Pierce, Fenner & Smith v. Cheng</u>, 697 F.Supp. 1224, 1227 (D.D.C. 1988): "It is clear from the case law that a stockbroker can be held liable to his client for negligence."  The <u>Cheng</u> court went on to state that although it did not find a private right of action based upon NASD rules, a violation of the NASD rules would be a "factor for consideration by the jury as to whether [the broker] acted as a 'reasonable' person in his conduct..." <u>Id.</u> (The NASD is now known as FINRA).

55.  Defendant and Defendant's agent owed a duty to Plaintiffs to obtain informed consent prior to purchasing investments, to discover relevant facts about their customer for suitability determinations, to truthfully disclose information about the monthly payments to be made by the annuity, to disclose the risks involved in the recommendations to purchase securities and other investments, to make suitable recommendations regarding the investments, to not make misrepresentations about the investments, to advise Plaintiffs about risk associated with the investments, to observe high standards of commercial honor and just and equitable

-14-

principles of trade, and to provide supervision regarding Plaintiffs' investments and accounts and Defendant's representative/agent.

56. Defendant and its agent negligently breached those duties by their acts and failure to act as set out herein.

57. As a direct and proximate result of the negligent actions and inaction of Defendant, Plaintiffs have incurred damages of up to $425,000.00, together with interest, costs, and loss of use of investment funds.

### Count VII.
### Breach of Fiduciary Duty

58. The allegations contained in paragraphs 1 through 57 are re-alleged and incorporated herein.

59. As set out by the 11th Circuit Court of Appeals: "[t]he law is clear that a broker owes a fiduciary duty of care and loyalty to a securities investor." Gochnauer v. A.G. Edwards & Sons, Inc., 810 F.2d 1042, 1049 (11th Cir. 1987).

60. A stockbroker is "an agent who owes his principal a duty to act only as authorized." Merrill Lynch v. Cheng, 901 F.2d 1124, 1128 (D.C. Cir. 1990). "As an agent, he has a duty to deal in the principal's interest… Moreover, he has a duty to give his principal information which is relevant to affairs entrusted to him of which he has notice." Id. The fiduciary responsibilities of a broker to his customer are more specifically set out as follows:

"(1) the duty to recommend a stock only after studying it sufficiently to become informed as to its nature, price, and financial prognosis; (2) the duty to carry out the customer's orders promptly in a manner best suited to serve the customer's interests; (3) the duty to inform the customer of the risks involved in purchasing or selling a particular security; (4) the duty to refrain from self-dealing or refusing to disclose any personal interest the broker may have in a particular recommended security; (5) the duty not to misrepresent

-15-

any material fact to the transaction; and (6) the duty to transact business only after receiving prior authorization from the customer."

Lieb v. Merrill Lynch, Pierce, Fenner and Smith, 461 F.Supp. 951, 953 (E.D.Mich. 1978) (citations omitted).  The Defendant owed these fiduciary duties to the Plaintiffs, and breached their fiduciary duties as set out above.

61.  At all times herein, Defendant acted in the capacity of agent and fiduciary custodian for Plaintiffs.  This fiduciary relationship arose out of Defendant holding itself and its agent out as registered securities agents and accepting compensation for their services, the Defendant's superior knowledge and experience regarding securities and investments, and the representations made by Defendant to Plaintiffs in regard to the investments.  Acting in these capacities, Defendant owed Plaintiffs the fiduciary duties of good faith, fair dealing, trust, and integrity in its dealings with Plaintiffs and in its maintenance of the investments, supervision of the investments, and recommendations regarding the investments.  Defendant also owed the Plaintiffs the duty not to self-deal and to supervise and prevent self-dealing by their agent. Defendant was further bound to comply with the duties required by the FINRA Rules, specifically the rules in regard to suitability and knowing one's customer.  Said duties were breached by the Defendant and its agent by their action and inaction set out herein.

62.  As a direct and proximate result of the Defendant's aforesaid conduct and breaches of fiduciary duties, Plaintiffs incurred damages of up to $425,000.00, together with interest, costs, and loss of use of investment funds.

### Count VIII.
### Breach of Contract

63.  The allegations contained in paragraphs 1 through 62 are re-alleged and incorporated

-16-

herein.

64.  Defendant and its representative were members of FINRA (also formerly known as NASD) at the time of the wrongful conduct set out herein.  As such, they are contractually bound by its rules and regulations.   As a customer of Defendant, Plaintiffs were third party beneficiaries of the Defendant's contracts and agreements with FINRA and the Rules promulgated by FINRA.  Furthermore, Defendant had an express and implied contract with Plaintiffs to comply with FINRA Rules.  Defendant's unsuitable recommendations and misstatements and omissions violated FINRA Rules, some of which are cited above.

65.  Plaintiffs and Defendant further had an explicit and implicit agreement that Defendant would comply with FINRA Rules and Virginia Insurance Regulations.

66.  By their aforesaid action and inaction, Defendant violated FINRA rules and Virginia Insurance Regulations, and breached its express and implied contract with FINRA and Plaintiffs, and as a direct and proximate result, Plaintiffs incurred damages of up to $425,000.00, together with interest, costs, and loss of use of investment funds.

**Count IX.**
**Defendant's Liability for their Representative's Actions**

67.  The allegations contained in paragraphs 1 through 66 are re-alleged and incorporated herein.

68.  As Plaintiffs' brokerage firm and the registered Broker-Dealer and supervisor of Mr. Dawkins, Defendant is jointly and severally liable for all of the damages set out herein to the same extent that its representative is liable.

69.  This liability stems from multiple sources. Under Virginia common law, an employer/principal is liable for its agent's negligence, fraud, and torts and liable under the doctrine of *respondeat superior*.

70.  Virginia law on liability of a principal for the torts of its agent is stated in <u>United Brotherhood v. Humphreys,</u> 127 S.E.2d 98, 203 Va. 781, 786 (1962):

> "A principal is responsible for the willful or malicious acts of his agent committed within the scope and course of his employment.  The test of the liability of the principal for the tortious acts of his agent is not whether tortious act itself is a transaction within the ordinary course of the business of the principal, or with the scope of the agent's authority, but whether the service itself in which the tortious act was done was within the ordinary course of such business or within the scope of such authority."

71.  Additionally under Virginia common law, a principal is subject to liability for the fraudulent acts of its agent.  The standard for such liability is set out by the Virginia Supreme Court in <u>Dudley v. Estate Life Ins. Co.,</u> 220 Va. 343, 349, 257 S.E.2d 871 (1979) (quoting from <u>Restatement (Second) of Agency</u>):

> "A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud…
> The principal is **subject to liability under the rule stated in this Section although he is entirely innocent, has received no benefit from the transaction, and, as stated in Section 262, although the agent acted solely for his own purposes.**  Liability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him."

(Emphasis added.)

72.  Control person liability under the Virginia Securities Act, Va. Code § 13.1-522 also provides for joint and several liability:

> "C. Every person who directly or indirectly controls a person liable under subsection A or B of this section, including every partner, officer, or director of such a person, every

person occupying a similar status or performing similar functions, every employee of such a person who materially aids in the conduct giving rise to the liability, and every broker-dealer, investment advisor, investment advisor representative or agent who materially aids in such conduct shall be liable jointly and severally with and to the same extent as such person, unless able to sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There shall be contribution as in cases of contract among the several persons so liable."

73.    Defendant is also liable for its representatives' action and inaction under federal

securities laws, Section 20(a) of the Securities Exchange Act [15 U.S.C. § 78t]:

"[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

74.    FINRA Rule 3010(a) states that each member shall:

"establish and maintain a system to supervise the activities of each registered representative and associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with the Rules of this Association. Final responsibility for proper supervision shall rest with the member."

75.    Defendant violated Virginia Insurance Regulations, FINRA Rule 3010, and other

FINRA Rules by their failure to reasonably supervise their agent and representative and their

negligent supervision of their agent and representative.

76.    Based upon the above, liability for all damages in this case (up to $425,000.00,

together with interest, costs, and loss of use of investment funds) should be imposed on

Defendant.

**Jury Demand**

Plaintiffs hereby demand a trial by jury with regard to the claims and Counts herein.

**Relief Requested**

WHEREFORE, for the foregoing reasons, Plaintiffs request that a judgment be rendered against Defendant based on the foregoing Counts, as follows:

a. Specific Performance of the promised sale of a variable annuity that would provide lifetime payments of at least $1,700.00 per month for both Kyle Almond's and Lynn Almond's lifetimes. Alternatively, Order rescission of the original sale paying back the Almonds the original amount invested. Alternatively, pay the Almonds their compensatory damages of $100,000 to $425,000, or a greater amount as determined by the trier of fact;

b. Interest assessed up to the time of payment of the award;

c. Opportunity loss of use of investment funds damages;

d. Punitive damages of $350,000.00 to Plaintiffs;

e. Those costs, expert fees, court costs, and attorney's fees incurred by Plaintiffs in order to prosecute this action (Plaintiffs are being represented on a *pro bono* basis, but reserve the right to seek attorneys fees should that change);

f. Such other further relief to which Plaintiffs may be justly entitled as determined by the trier of fact.

KYLE E. ALMOND, and
LYNN P. ALMOND,
By Counsel

Date: Feb. 23, 2018

W. Scott Greco (VSB # 37341)
Frederick D. Greco (VSB # 4812)
Counsel for Plaintiffs
GRECO & GRECO, P.C.
1300 Old Chain Bridge Road
McLean, Virginia 22101
Telephone (703) 821-2777
Facsimile (703) 893-9377
wsgreco@grecogrecolaw.com

-21-